## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

| | |
|---|---|
| MARYAM KARIMI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 20-cv-12127-AK |
| | ) |
| TOWN OF BROOKLINE, | ) |
| | ) |
| Defendant. | ) |

———————————————————————

## <u>MEMORANDUM AND ORDER</u>

**A. KELLEY, D.J.**

Plaintiff Maryam Karimi ("Karimi"), who worked in the Circulation Department at the Brookline Library (the "Library") for many years, brings this action for discrimination and retaliation against the Town of Brookline (the "Town"). Karimi alleges gender, race, national origin, and color discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and retaliation pursuant to the same. [Dkt. 1 at ¶¶ 61-68]. The Town has moved for summary judgment on all counts. [Dkt. 33]. The Court heard oral argument on May 16, 2022. For the following reasons, the Town's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

### I. Background

Because the timeline of events is integral to Karimi's allegations of retaliation, the Court recites the facts largely in chronological order. Karimi began working at the Library in 2003 and became a full-time Library Assistant in 2006. [Dkt. 35 ("Town SOF") at ¶ 3; Dkt. 49 ("Karimi SOF") at ¶ 1]. She has a Bachelor of Science in Computer Science and a certificate in Systematic Programming and Real-Time Systems. [Town SOF at ¶ 2; <u>see</u> Karimi SOF at ¶ 1].

Karimi is an Iranian-American woman who identifies as white. [Town SOF at ¶ 1; Karimi SOF at ¶ 1; Dkt. 49 at 9-14 ("Karimi Response to Town's SOF") at ¶ 1)]. The Town employs progressive discipline for employees, including Karimi, who are members of a union, in compliance with a collective bargaining agreement. [Town SOF at ¶ 5]. The disciplinary process generally begins with a counseling session, followed by a verbal warning, written warning, suspension, and termination. [Id.]. This is not a strict approach, and the Town may begin or proceed with the process differently depending on the severity of the misconduct. [Dkt. 36 at 59].

### A. 2011-2012 Disciplinary Actions

Karimi's customer service and disciplinary issues began in 2011. In April 2011, Chuck Flaherty ("Flaherty"), the former Library Director, issued a written warning to Karimi after two patrons complained about her "unhelpful," "unsympathetic," and "rude" tone. [Town SOF at ¶ 6; Dkt. 36 at 70]. In that warning, Flaherty noted that he and Brenda Craig ("Craig"), the Library's Circulation Supervisor, had "spoken to [Karimi] at least twice in the past three years concerning [her] customer service skills." [Dkt. 36 at 70]. Flaherty informed Karimi that "any further incidents of poor customer service" would "not be tolerated" and would "lead to disciplinary action, up to and including termination." [Id.]. Flaherty then suspended Karimi for one day in December 2012 for a "customer service related incident" involving her interaction with a young girl and her mother. [Town SOF at ¶ 7; Karimi SOF at ¶ 2; Dkt. 36 at 72; Dkt. 50-2]. In the letter notifying Karimi of her one-day suspension, Flaherty noted that they "have had several meetings to discuss problems with the way customers feel they are treated by you," referenced his April 2011 written warning, and stated that Karimi's recent actions indicated she "still [did] not grasp the importance of good customer service." [Dkt. 36 at 72-73].

### B.  2014-2016 Discrimination Complaints

While the next couple years passed largely without customer service incidents, Karimi alleges several discriminatory acts beginning in 2014.  In October 2014, Craig informed Karimi and another Library employee, Sima Hajhariri ("Hajhariri"), that a staff member had complained about them speaking Farsi to one another.  [Town SOF at ¶ 8; Karimi SOF at ¶ 3].  Hajhariri emailed Sara Slymon ("Slymon"), the Library Director, about the matter and wanted to know whether there was a rule about speaking only English at work.  [Dkt. 36 at 76].  Hajhariri expressed her belief that "it is very discriminatory when an [sic] staff is looking for some excuses [sic] to complain about another staff and finds nothing but clinging to the issue of others' native origin."  [Id.].  Slymon replied that the "intent [was] not at all discriminatory" and that she "would never ask [them] to completely refrain from speaking Farsi, it's a beautiful language, and does our patrons good to see that we have a diverse and educated staff," but she hoped "that [they] might think about how co-workers might feel if they are the only other person there, unable to understand everything being said around them and unable to join in."  [Town SOF at ¶ 8; Karimi SOF at ¶ 3; Dkt. 36 at 75].  Hajhariri responded that this explanation was "totally understandable."  [Dkt. 36 at 75].  Karimi later stated that she believed this request was discriminatory because speakers of other languages, including Chinese, did not receive the same direction, though she offers no proof of this.  [Dkt. 50-1 at 41; see Karimi SOF at ¶ 3].

Around April 2015, the Town sought to hire an "Assistant Library Director for Technology," listing a master's degree in library science as one of the minimum requirements. [Town SOF at ¶ 11; Karimi SOF at ¶ 4; Dkt. 36 at 84-87].  Karimi applied for the position and was denied.  [Town SOF at ¶ 11; Karimi SOF at ¶ 4; Dkt. 50-5].  The Library ultimately hired Hank Sway, a white man who holds a Master of Science in Library and Information Science and,

at the time of his application, had many years of experience in libraries. [Town SOF at ¶ 11; Dkt. 36 at 92-95]. During Karimi's employment, the Library also employed three men, Colin Wilkins, Brian Hodgdon, and Roy MacKenzie, as Reference Librarians, a position that requires a master's degree in library science. [Town SOF at ¶¶ 18, 31]. Hodgdon and MacKenzie performed various technology-related tasks as part of their job responsibilities, although the extent of these duties, when they were assigned, and how they were trained are disputed. [See Town SOF at ¶¶ 21-24, 27-31; Karimi SOF at ¶ 5]. Although not the focus of her claims here, Karimi alleges these personnel decisions were discriminatory.

In the afternoon of December 7, 2015, Karimi's attorney emailed a letter to Sandra DeBow ("DeBow"), the Town's Human Resources Director, regarding Karimi's employment. [Town SOF at ¶ 26; Dkt. 36 at 113; Dkt. 50-32]. This letter states that Karimi "was passed over when Mr. Sway selected employees from different departments to be trained to assist him," and Karimi "was unquestionably denied an opportunity for further training and greater responsibility that might qualify her for promotion in the future," which "raise[s] serious concerns about discrimination at the Library on the basis of age, sex, religion and national origin." [Dkt. 36 at 114]. In connection with these allegations, Karimi's attorney and DeBow met in December 2015 and exchanged letters on the matter at least on January 25, 2016, and March 14, 2016. [Karimi SOF at ¶ 6; Dkts. 50-9, 50-32].

In mid-March 2016, Karimi complained to Craig that she was being treated differently than other Library employees because of her national origin. [Karimi SOF at ¶ 8; Dkt. 50-11 at 2]. Karimi stated, "When people don't do the minimum requirement and I am told to go way beyond the library policy. I wonder what would have happened if I was born in the U.S.?" [Karimi SOF at ¶ 8; Dkt. 50-11 at 2]. Craig responded that it is the Library and Town's

responsibility to make all citizens "feel welcomed and appreciated" and copied Anne Reed

("Reed"), the Assistant Library Director, who informed Slymon of the issue.  [Dkt. 50-11 at 1].

Karimi then applied for the position of "Assistant Library Director for Technology" in

September 2016, and Callan Bignoli, a white female who holds a Master of Science in Library

and Information Science, was hired.  [Town SOF at ¶¶ 36-37; see Dkt. 36 at 133-40].

### C.  2016 Three-Day Suspension

Shortly after this, Karimi's disciplinary issues resumed.  Although there had been some

complaints about Karimi between her 2012 one-day suspension and this time, the years had

passed largely incident-free.  On May 25, 2016, a Library patron emailed Craig to lodge a

complaint about Karimi.  [Town SOF at ¶ 32; Karimi SOF at ¶ 9; Dkt. 50-12; Dkt. 36 at 125].

This patron noted that he had had many interactions with Karimi[1] over the years, and

"[p]oliteness never even enters the picture."  [Dkt. 36 at 125].  When the patron asked Karimi

about summer hours the previous evening, her "hatred, loathing, and disgust were more than

palpable," though the patron believed Karimi was "capable of warmth and friendliness" because

he had "seen her engaged in conversations with women many, many times."  [Id.].  The patron

further stated that he "get[s] that she hates men" and "[m]aybe something tragic has happened to

her" or "[m]aybe it's cultural," but he did not understand why she "take[s] it out on strangers"

and "can't talk to men as if they might be decent human beings."  [Id.].  On May 27, 2016, the

patron requested that Craig disregard his email, stating that he was ashamed "to have been so

petty and so unkind" and that Karimi needed "compassion and kindness to help find healing in

her life" for whatever she had "gone through to make her so unfriendly."  [Dkt. 50-12 at 2].

When Craig informed Reed of the patron's second email, Reed responded that the Library could

---

[1] The patron did not identify Karimi by name, but it was later determined that Karimi was the Library employee referenced in the email.

not ignore the original email and that she would check with Human Resources because Karimi had "a pattern of poor customer service which need[ed] to be addressed." [Id.]. Reed forwarded the communications to the Town, noting she was unsure whether they "should ignore the email or use it as another example of the need for Maryam [Karimi] to improve her customer service skills." [Id. at 1].

Karimi met with Slymon to discuss the patron's complaint on June 7, 2016, after which Slymon decided there was "just cause for discipline, to be progressive in nature." [Dkt. 36 at 129]. On June 8, 2016, Karimi received a three-day suspension for "exhibit[ing] disgust toward a patron in [her] response to an inquiry regarding library summer hours" and for being "impolite, curt, and unfriendly toward a patron while at the circulation desk." [Town SOF at ¶ 34; Dkt. 36 at 129]. The suspension letter reminded Karimi that the Library had "given [her] both verbal and written warnings that unprofessional and/or rude behavior will not be tolerated in the Library" and noted her "prior discipline for similar behavior" that resulted in a one-day suspension. [Dkt. 36 at 129]. The letter warned Karimi that she would "be subject to additional discipline up to and including discharge from employment" if the behavior continued. [Id.].

### D. 2016 Five-Day Suspension

On May 31, 2016, after the patron complaint but prior to the issuance of Karimi's three-day suspension, one of Karimi's colleagues, Colin Wilkins ("Wilkins") reported to Craig and Reed that Karimi was in the "sorting room . . . with her shoes off and in a reclining position reading a magazine" while another Library employee monitored the circulation desk by herself and attempted to help "multiple patrons." [Town SOF at ¶ 35; Karimi SOF at ¶ 10; Dkt. 36 at 127]. Wilkins had another employee confirm what he saw. [Dkt. 36 at 127]. After a hearing, Slymon found "just cause for discipline, to be progressive in nature," and Karimi received a five-

day suspension on June 21, 2016.  [Town SOF at ¶ 35; Karimi SOF at ¶ 10; Dkt. 36 at 131].

Two months later, while appealing her suspensions, Karimi produced a note from her doctor,

dated August 29, 2016, explaining that she needed to take occasional breaks because she had

hypotension.  [Karimi SOF at ¶ 10; Dkt. 50-15].

    Karimi appealed her three- and five-day suspensions to the Library's Board of Trustees.

[Karimi SOF at ¶ 11].  On September 2, 2016, after Karimi initiated the appeal to lodge her

grievances, DeBow proposed a conference with Slymon and the Chair of the Library's Board of

Trustees to "have a quick conversation about how to prevent the Karimi hearing from becoming

a circus with the Brookline Justice League[2] in attendance."  [Karimi SOF at ¶ 11; Dkt. 50-17].

### E.  2015-2016 Performance Appraisal

    On October 5, 2016, Craig signed Karimi's performance appraisal, which Karimi

received on October 6, 2016.  [Town SOF at ¶ 38; Dkt. 36 at 140-51; Dkt. 50-20].  On a scale of

one to five, Karimi received several twos, which stand for "needs improvement."  [Dkt. 36 at

140-50; Dkt. 50-20].  Craig made several comments about Karimi's interactions with other staff

members.  For example, Craig noted that leaving part-time staff alone during closing was "not

acceptable."  [Dkt. 36 at 143; Dkt. 50-20 at 4].  Craig also commented that Karimi "could do a

better job [of] contributing to a more positive morale by not criticizing other departments" and

"should be less negatively focused on other staff/departments."  [Dkt. 36 at 146; Dkt. 50-20 at 7].

Karimi also received notes on her customer service.  Craig stated that Karimi's communication

with patrons returning late items "needs to improve as it often escalates into a confrontation and

poor customer service" and cautioned Karimi to "[k]eep in mind that tone, body language, and

---

[2] Karimi describes the Brookline Justice League as a "Brookline-based civil rights organization."  [Dkt. 1 at ¶ 56].
Counsel for the Brookline Justice League later wrote a letter to the Library Board of Trustees on Karimi's behalf in
December 2016, discussed infra.

facial expressions make a big difference in interacting with challenging patrons." [Dkt. 36 at 146; Dkt. 50-20 at 7]. Craig further commented that while she believed Karimi was "reasonably open to the public," Karimi "could improve [her] tone when responding to questions and answers. For example, if a patron asks about hours, services and locations you cannot ignore the question, or go to the other end of the counter to avoid them." [Dkt. 36 at 147; Dkt. 50-20 at 8]. Karimi disagreed with Craig's comments. [Dkt. 36 at 151; Dkt. 50-20 at 12]. In the section provided for staff members to list their goals for the next year, Karimi wrote, "I hope employees with poor manners will be spoken with. . . . I also hope that all staff will be treated equally and without discrimination with in [sic] order to change and create more friendly environment." [Dkt. 36 at 149; Dkt. 50-20 at 10].

### F. 2016 Ten-Day Suspension

Two incidents of insubordination that occurred on October 4, 2016 resulted in a ten-day suspension for Karimi on November 4, 2016. [Town SOF at ¶ 39; Karimi SOF at ¶ 15; Dkt. 36 at 153-55]. First, Karimi ordered a part-time worker to cover her desk shift after a supervisor, Julie Falsioni ("Falsioni"), denied Karimi's request to reduce her desk hours.[3] [Town SOF at ¶ 39; Karimi SOF at ¶ 15; Dkt. 36 at 154]. Second, that same day, Karimi was "surfing the internet for extended periods of time on non-work related matters." [Town SOF at ¶ 39; Dkt. 36 at 154; see Karimi SOF at ¶ 15]. Karimi and her union representatives attended an investigatory

---

[3] Karimi claims that Falsioni, who initiated the complaint of insubordination against Karimi, was not, in fact, her direct supervisor. [Karimi SOF at ¶ 15]. The evidence suggests otherwise. Karimi herself had previously treated Falsioni as one of her supervisors. [See Dkt. 50-2]. When Karimi challenged her 2012 suspension, she told the Library Board of Trustees that she "called one of her supervisors, Ms. Falsioni for assistance" when the mother and child were upset with Karimi. [Id. at 1]. Karimi goes so far as to allege that there was a "cover up" by the Library to doctor Falsioni's job description so that it would appear she was Karimi's supervisor. [Karimi SOF at ¶ 15; see Dkt. 50-24]. In response to a request, Falsioni had provided Reed and Craig with her job description as it was written seventeen years prior, which apparently did not specify supervisory duties. [Dkt. 50-24 at 2]. It does not take a great imagination to conclude that Falsioni's responsibilities may have changed during that time, even if the job description was not updated accordingly. Moreover, Falsioni sent that email to Reed and Craig on September 28, 2016, prior to Karimi's insubordination incident. [Id.].

meeting on the matter, and the Town's review of their records indicated that Karimi had never applied for or been approved for intermittent leave with respect to a claimed medical condition necessitating reduced hours or unplanned breaks.  [Dkt. 36 at 154].  These two incidents, in light of Karimi's "past disciplinary record," resulted in a ten-day suspension.  [Id.].

**G.  October 2016 Email to Library Patrons and 2017 Termination**

On October 15, 2016, Karimi emailed Library patrons for support regarding the pending appeal of her suspensions.  [Town SOF at ¶ 40; Karimi SOF at ¶ 13; Dkt. 50-21].  Several of these patrons then contacted the Library's Board of Trustees to offer support for Karimi.  [Town SOF at ¶ 41].  After receiving these emails, the Town investigated whether and how Karimi had obtained the patrons' email addresses.  [Town SOF at ¶ 41; see Karimi SOF at ¶ 16].  On November 1, 2016, Slymon, Karimi, and Karimi's union representative met to discuss the Town's concerns that Karimi had accessed confidential patron information through the Library's database.  [Town SOF at ¶ 42; Karimi SOF at ¶ 14].  On December 13, 2016, Slymon instructed Karimi to appear for an investigatory meeting regarding the matter.  [Town SOF at ¶ 43; Dkt. 36 at 157].  On December 16, 2016, the investigatory meeting took place.  [Town SOF at ¶ 44; Karimi SOF at ¶ 17].

On December 21, 2016, Karimi, through her counsel at the Brookline Justice League, sent a letter to the Library Board of Trustees regarding Karimi's employment.  [Town SOF at ¶ 46; Karimi SOF at ¶ 18; Dkt. 36 at 168-70].  This letter expressed Karimi's belief that the Library was engaged in an "ongoing course of discrimination . . . based on her national origin (Iranian) and gender."  [Dkt. 136 at 168].  Karimi claimed that since she brought "the issue of unequal treatment" to the Town's attention regarding the "information technology position," she had "been targeted for multiple disciplinary investigations and actions by the Town's staff" that

were "intended to retaliate against Ms. Karimi for asserting her right to equal treatment and equal opportunity." [Id.]. Karimi believed that the Town was "'piling on' charges against her in an effort to force her to resign or to justify ultimately terminating her." [Id.]. Although DeBow wrote to the Chair of the Library's Board of Trustees about the matter, noting the Town would be performing an investigation into Karimi's allegations of discrimination and retaliation, it is unclear whether an investigation occurred. [Karimi SOF at ¶ 19; Dkt. 50-27].

On January 26, 2017, Slymon scheduled a hearing with Karimi to discuss her misappropriation of patron email addresses. [Karimi SOF at ¶ 23]. On January 31, 2017, one day after the hearing, the Town notified Karimi that her employment had been terminated after it concluded that Karimi accessed confidential patron information for personal use in violation of the Library's policies and that she provided conflicting accounts of the incident. [Town SOF at ¶ 48; Karimi SOF at ¶ 23; Dkt. 36 at 193-95]. Also on January 26, 2017, Karimi filed a discrimination charge against the Town with the Massachusetts Commission Against Discrimination ("MCAD"), which MCAD transmitted on February 3, 2017, and which the Town received from MCAD on February 14, 2017. [Town SOF at ¶ 47; Dkt. 36 at 172-91].

## II. Legal Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted). The Court must determine (1) whether a factual dispute exists; (2) whether the factual

dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001). Courts must draw "all reasonable inferences" in the non-moving party's favor, Mesnick, 950 F.2d at 822, and the non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists," Paul, 948 F.3d at 49. On issues where the non-moving party bears the ultimate burden of proof, the non-moving party "must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822.

### III. Discussion

Karimi brings two claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. First, she alleges the Town discriminated against her because of her gender, national origin, race, and color. [Dkt. 1 at ¶¶ 61-64]. Second, Karimi contends that the Town retaliated against her for having opposed the Town's discrimination. [Id. at ¶¶ 65-68]. The Town attempts to break Karimi's allegations into eleven discrete events and argues that several of these events are untimely or do not constitute adverse employment actions. [See Dkt. 34 at 1-3]. The Court will not treat Karimi's allegations as discrete events for the purpose of summary judgment. Rather, the Court will view these incidents "as part of an aggregate package of proof offered by the plaintiff" in Karimi's quest to establish that the Town's proffered reasons for her alleged mistreatment are pretext. Mesnick, 950 F.2d at 824 (noting that plaintiffs "should not be required to produce 'smoking-gun' evidence before prevailing in a discrimination suit" and courts do not look at evidence of discrimination "in splendid isolation"). As such, the Court

rejects the Town's arguments regarding timeliness.[4]  [See Dkt. 34 at 3-5].

### A.  Discrimination

Although it is not explicitly stated in her complaint, Karimi's discrimination claim rests

on her allegedly unlawful termination from the Library, rather than general disparate treatment or

a failure to promote.[5]  See Mesnick, 950 F.2d at 822 (rejecting the plaintiff's attempt to

"balkanize this [discrimination] claim into several segments" and explaining that the

"discrimination case must rise or fall on whether he offered sufficient facts to show that he was

wrongfully discharged").  In discrimination suits, the "ultimate burden of persuasion always

remains on the plaintiff."  Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012).  The

plaintiff first must establish a prima facie claim of discrimination.  Id. at 93.  A prima facie claim

based on wrongful termination requires the plaintiff to show that (1) she is a member of a

protected class; (2) she performed her job at an "acceptable level"; (3) she was terminated; and

(4) the plaintiff's position was filled by someone with similar qualifications.  Scott, 141 F. Supp.

2d at 172; see Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011) (explaining that a

plaintiff may show a causal connection between membership in a protected class and the adverse

action by providing evidence that the position was filled "by someone with similar qualities").

The defendant must then rebut the plaintiff's prima facie showing by producing evidence of

"legitimate, non-discriminatory reasons for the challenged conduct."  Bhatti, 659 F.3d at 70.  If

the defendant produces such evidence, the plaintiff must "offer evidence sufficient to support a

finding that it is more likely than not that the employer's proffered reason for the adverse

---

[4] The Court will afford neither preclusive effect nor deference to the arbitrator's findings or decisions.  See Alexander v. Gardner-Denver Co., 415 U.S. 36, 55-56 (1974) ("The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal.").

[5] At the motion hearing, counsel for Karimi confirmed that the gravamen of Karimi's claim was her termination and that the other allegations provide context relevant to the Court's pretext inquiry.

employment action was pretext and that the true reason was unlawful discrimination." Joseph v. Lincare, Inc., 989 F.3d 147, 158 (1st Cir. 2021) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973)).  That is, the plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." Paul, 948 F.3d at 49 (citation omitted).

The parties do not dispute that Karimi belongs to a protected class.  Rather, the Town argues that Karimi has failed to establish a prima facie claim of discrimination because she was not meeting the legitimate expectations of her job and has not provided evidence related to the individual who was hired to replace her.  [Dkt. 34 at 22].  The Town also contends that legitimate, nondiscriminatory reasons motivated the Town's actions.  [Id.].  Karimi counters that these proffered reasons are mere pretext.  As an initial matter, Karimi has not provided any evidence that her position was filled by someone with similar qualifications.  This alone dooms her claim for discrimination.  Mesnick, 950 F.2d at 824 ("If the plaintiff has failed to limn a prima facie case, the inference of discrimination never arises, and the employer's motion for summary judgment will be granted.").  However, even if Karimi meets her prima facie burden, her discrimination claim does not survive summary judgment, as she has failed to show that the Town's reasons for her termination are pretext for a discriminatory motive.  See Joseph, 989 F.3d at 158 n.5 ("[I]f there are material issues of fact as to the elements of the prima facie case, but the employer articulates a legitimate, nondiscriminatory reason for the adverse employment action and the plaintiff fails to show pretext, summary judgment is also appropriate.").

### 1.  The Town's Reason for Karimi's Termination

The Town terminated Karimi after an investigation, including interviews with Karimi and union representatives, because she "accessed patron information, specifically patron email

accounts," from the Library's database and "forwarded these emails to [her] personal e-mail account." [Dkt. 36 at 193]. The Town found that Karimi acknowledged "that [she] knew accessing patron contact information, such as emails, for personal use was strictly prohibited" and did not find Karimi credible when she later tried to retract her statements. [Id. at 193-4]. The evidence shows that Karimi emailed Library patrons from her personal email address and requested their support as she pursued discrimination claims against the Town. [See Dkt. 50-21]. It also shows that she sent email addresses of Library patrons to her personal email account from her Library email address. [See Dkt. 50-25]. Karimi does not dispute that accessing patron email addresses for personal use is a violation of Library policies, including the Minuteman Library Network Privacy Policy, the Town of Brookline Policy on the Use of Information Technology, the Code of Ethics of the American Library Association, and the State Ethics Law. [See Dkt. 36 at 194; Town SOF at ¶ 48; Karimi Response to Town's SOF at ¶ 48]. Moreover, as the Town noted in its termination letter, Karimi's disciplinary history, which included three suspensions for customer service complaints and insubordination within eight months of her termination, supports the Library's finding that it had good cause to terminate Karimi. Karimi's violation of Library policies, alone or as the next step in progressive discipline, is a legitimate, non-discriminatory reason sufficient to meet the Town's burden of production. See Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 13-14 (1st Cir. 2011) (finding that "documented instances of noncompliance with a raft of company policies and rules," among other factors, satisfied the defendant's burden of production in a pregnancy discrimination case).

### 2. Pretext

A plaintiff may show that the employer's explanation for the adverse employment action is pretext by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons."  Joseph, 989 F.3d at 160 (citing

Pina v. Children's Place, 740 F.3d 785, 797 (1st Cir. 2014)).  To meet this burden, a plaintiff

must provide specific facts supporting the "inference that the real reason [behind the employer's

actions] must be discriminatory animus," that is, that the "reason given is not only a sham, but a

sham intended to cover up the employer's real and unlawful motive of discrimination."  Id.

(citing Theidon v. Harvard Univ., 948 F.3d 477, 497 (1st Cir. 2020)).  A plaintiff may establish

such pretext and animus in a variety of ways.  For example, a plaintiff can provide evidence that

other employees—particularly those not belonging to the plaintiff's protected class—who

behaved similarly were not disciplined or terminated.  See Kouvchinov v. Parametric Tech.

Corp., 537 F.3d 62, 69 (1st Cir. 2008) ("[T]he plaintiff adduced no evidence that any other PTC

employee thought to have committed an ethical breach or to have been guilty of some peccadillo

comparable to double-dipping was treated any differently.");  see also McDonnell Douglas, 411

U.S. at 804 (noting that, in a case of race discrimination, "evidence that white employees

involved in acts against petitioner of comparable seriousness . . . were nevertheless retained or

rehired" while the plaintiff was not would be "[e]specially relevant").  A plaintiff may also show

animus by offering evidence of "comments by decisionmakers which denigrate" members of the

protected class.  Mesnick, 950 F.2d at 824.  Evidence that the employer provided "different and

arguably inconsistent explanations" for the adverse employment action also supports charges of

pretext.  Billings v. Town of Grafton, 515 F.3d 39, 56 (1st Cir. 2008) (citing Dominguez-Cruz v.

Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000)).  Karimi offers no such evidence.

Instead Karimi asserts that the Town's grounds for terminating Karimi are "implausible"

because the purpose of her contact with the Library patrons was not "nefarious"; patron email

addresses were not shared with third parties; Karimi denied "any improper access"; no policy

prohibited "fraternization between employees and patrons"; and no other Library employee had ever been investigated for a similar offense.  [Dkt. 48 at 4].  These arguments miss the mark for several reasons.  First, the motivation underlying Karimi's misappropriation of email addresses and the fact that Karimi did not share patron contact information with third parties are irrelevant. The Library had policies prohibiting Karimi's actions regardless of purpose.  A person's privacy is no less valued or protected simply because the individual seeking the information believes her reason for violating that privacy is worthy of such an intrusion.  Second, the evidence, including an email from Karimi's Library account to her personal account listing the email addresses of multiple library patrons, suggests that Karimi did access patron information through the Library despite her protestations otherwise.  [See Dkt. 36 at 193-95; Dkt. 50-25].  Even if Karimi did not use Library resources to find patron contact information for personal gain, the Town believed that Karimi misappropriated patron email addresses for private use, which prompted their investigation and her termination, and the Town explained that it did not find Karimi's denial of the charges credible because she had given conflicting statements during a series of interviews. [Dkt. 36 at 193-95]; see Kouvchinov, 537 F.3d at 67 ("When assessing a charge of pretext in an employment discrimination case, the focus is on the mindset of the actual decisionmaker.  This holds true even when the decisionmaker is relying on information that may later prove to be inaccurate.  In other words, it is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception.  Instead, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action."); Mesnick, 950 F.2d at 824 (explaining that the pretext determination depends on "whether the employer believed its stated reason to be credible").  Third, while Library policies may not have prohibited "fraternization between employees and patrons," policies did prohibit the unauthorized access of

patron information.  Fourth, to the Town's knowledge, no other employee has ever committed a

similar offense.  [Dkt. 50-22 at 3].  The fact that no other Library employee has been investigated

or disciplined for misappropriating patron contact information does not imply discriminatory

animus; rather, it suggests that previous employees, unlike Karimi, complied with the Library's

policy protecting patron privacy.[6]

      Karimi also argues that her "escalating series of disciplinary actions" and negative

performance review after many years of satisfactory work suggest pretext.  [See Dkt. 48 at 2-3].

While the "incidence of differential treatment in the workplace" can indicate pretext, Karimi has

not offered such evidence.  Mesnick, 950 F.2d at 824.  Rather, there are legitimate, non-

discriminatory explanations for all the disciplinary actions Karimi argues are evidence of pretext,

and these allegedly discriminatory events instead demonstrate that Karimi was disciplined and

terminated for "serious and continuing performance problems," not unlawful bias.  Scott, 141 F.

Supp. 2d at 170 (finding no genuine issue of material fact in a discrimination case where the

plaintiff was terminated for performance issues and the plaintiff failed to show "that men with

like records remained in the company's employ").   Karimi maintains that, prior to 2016, she had

been employed by the Town for thirteen years, was suspended only once three years before then,

and had received a positive performance evaluation for 2014-2015.  [Dkt. 48 at 2].  While all of

that is true, it does not paint the whole picture.

      Karimi first received a written warning regarding her customer service skills in April

---

[6] Karimi also claims that Flaherty, the former Library Director, testified that he did not regard Karimi's alleged offense as requiring termination, which suggests that the Town's proffered reason for Karim's termination is implausible.  [Dkt. 48 at 4].  Karimi, however, selectively relays Flaherty's testimony.  Flaherty stated, "Discipline should be progressive.  I would not necessarily consider it [using Library resources to obtain patron email addresses for personal use] a firing offense if it's *the first instance* of—or the *first disciplinary action* that's being considered, but I'm sure that other library directors might feel differently about that."  [Dkt. 50-30 at 8 (emphasis added)].  This was not Karimi's first offense.  In fact, she had been suspended three times in the previous eight months.  Flaherty's opinion, especially when considered in full, does not suggest pretext.

2011, but her troubles began before that.  Flaherty noted in that written warning that he had spoken with her about her customer service issues at least twice in the three years prior.  [Dkt. 36 at 70].  Karimi was then suspended in December 2012 for a customer-service incident, and her suspension letter stated that the Library had held "several meetings to discuss problems with the way customers feel they are treated" by Karimi.  [Dkt. 36 at 72].  Karimi's performance problems clearly began well before the events underlying this action.  Moreover, Karimi's 2014-2015 performance evaluation, even if generally positive, also commented on Karimi's interpersonal issues.  Craig, her Department Head, stated that Karimi's "choosing not to engage in issues with staff at the Circulation Desk has improved" and bi-weekly meetings would "help to improve morale, as well as reduce tensions, bridge differences and sort through any issues before they become a problem." [Dkt. 50-19 at 3, 5].  Craig also noted that "avoiding any minor issues to improve public service is a priority" and that "[i]nteract[ing] with the public professionally, responsively, and respectfully" was a "remedial" activity Craig would help Karimi with.  [Id. at 6, 9].  Despite the lack of official discipline in the three years preceding Karimi's renewed disciplinary issues, customer service and interpersonal skills clearly remained an ongoing issue.

Karimi also posits that the Town knew the basis for the complaints that led to her suspensions were "suspect and that the punishments did not fit the alleged crimes."  [Dkt. 48 at 3].  Karimi's three-day suspension resulted from a patron complaint regarding Karimi's rudeness when he asked her a question about Library hours.  Two days later, this patron requested the Library disregard his email because he was "ashame[d]" to "have been so petty and so unkind." [Dkt. 50-12 at 2].  While the patron requested the Library disregard his complaint, he did not recant it.  In fact, his second email reaffirms that his interactions with Karimi had been

"unfriendly."  [Id.].  No employer needs to ignore an issue with an employee simply because a customer does not wish them to take adverse action.  As noted by Reed, the then-Acting Library Director, this was merely "another example of the need for Maryam [Karimi] to improve her customer service skills," and the Town proceeded with disciplinary action because Karimi had "a pattern of poor customer service," as exemplified by her previous verbal and written warnings and one-day suspension.  [Id. at 1-2].  While Karimi claims that the patron did not recall anyone from the Library or Town contacting him further to discuss his complaint, this is of little consequence.[7]  [Dkt. 48 at 3].  Karimi does not provide any evidence that it was the Town's official or unofficial policy or practice to interview patrons who authored detailed, written complaints about employees, nor does Karimi offer evidence that the Town handled this complaint differently than it did others.  See Adamson v. Walgreens Co., 750 F.3d 73, 81 (1st Cir. 2014) (finding no genuine issue of material fact as to whether the employer "believed the truth of its stated reason for terminating" the plaintiff after a customer complained about the plaintiff).  Moreover, the Town held a meeting with Karimi about the incident, thereby giving Karimi an opportunity to contest the complaint.  [See Dkt. 36 at 129].  Given Karimi's history of similar incidents, the Town's decision to credit the complaint, rather than Karimi, does not imply pretext or discriminatory animus.  The Town consistently noted Karimi's history of customer service issues throughout the disciplinary process, including upon receipt of the patron's email and in the official suspension letter.  See Billings, 515 F.3d at 56.  Nothing suggests that the

---

[7] During a deposition taken in connection with this litigation, the patron who authored the complaint stated that he had substance abuse issues at the time he sent the email, and his comments may not have been "reliable."  [Dkt. 48 at 3].  This admission, however, occurred years after the complaint, and nothing suggests the Town was aware of any such issue at the time of Karimi's three-day suspension.  See Kouvchinov, 537 F.3d at 67 (noting that "the focus is on the mindset of the actual decisionmaker" when evaluating pretext); see also Joseph, 989 F.3d at 160 (noting that the plaintiff must provide specific facts enabling a factfinder to find that the "reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination").  As explained, Karimi's history of customer service issues and rudeness toward patrons was well-documented, and the Town's response to the complaint was reasonable under the circumstances.

Town knew the complaint was suspect, nor that the punishment was extreme given the circumstances.  The Town has provided a legitimate, non-discriminatory explanation for Karimi's three-day suspension, and Karimi has failed to show that the Town's proffered reason is pretext for a discriminatory purpose.

As to her five-day suspension, Karimi argues that Wilkins, the colleague who notified Library leadership of Karimi's unauthorized break, had been the subject of complaints by Karimi's supervisor for "targeting" their department and "overstepping his authority."  [Dkt. 48 at 3].  Even if true, this does not demonstrate discriminatory animus toward Karimi.  At most, it suggests inter-departmental conflict and a lack of professionalism, which falls short of discrimination.  See Paul, 948 F.3d at 52 ("But, an employer who requires an employee to engage with others in the workplace in a professional manner does not, in doing so, engage in conduct that supports an inference of discrimination."); see also Nwachukwu v. Vinfen Corp., No. 16-cv-11815-MPK, 2019 WL 5698461, at *6 (D. Mass. Nov. 4, 2019) (noting that "complaints made by [the plaintiff's] co-workers against him" constitute a "legitimate, non-discriminatory reason" for termination).  Nothing indicates that the Town did not believe Wilkins's report of Karimi's unauthorized break, which another employee corroborated, and, in fact, Karimi does not dispute that she took the break. See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005) ("The question is not whether plaintiff's or his fellow employees' version is the true one, but whether [the supervisor] and his superiors believed what he had been told by those he interviewed.").  Karimi instead contends that the Town "ignored medical evidence that explained" Karimi's unauthorized break, which indicates pretext.  [Dkt. 48 at 3].  However, the doctor's note she submits in support of this statement is dated August 29, 2016—well after the suspension was issued and served—and Karimi does not offer evidence that

she otherwise informed the Town that she required breaks to treat a medical condition prior to, or immediately after, the incident.[8]  [See Dkt. 50-15; Dkt. 36 at 131].

Karimi does not submit any evidence of employees similarly taking unauthorized breaks and escaping discipline, nor does she provide evidence suggesting Karimi was subject to a double standard, stereotyping, or cognitive bias indicative of discriminatory animus.  See Paul, 948 F.3d at 52.  The Town reported three other instances of employees, all white females, taking unauthorized breaks during the relevant time period.  [Dkt. 50-22 at 2].  After investigation, one was not disciplined, one received a verbal warning and counseling session, and one received a counseling session.  [Id.].  While this discipline is a far cry from Karimi's five-day suspension, Karimi offers no evidence that these employees were similarly situated, which undermines any claim of disparate treatment.  See Paul, 948 F.3d at 52 (rejecting the plaintiff's argument that colleagues were not punished for comparable behavior where there was no evidence suggesting that the plaintiff's co-workers were similarly situated in "all relevant aspects," including "performance, qualifications and conduct," without "differentiating or mitigating circumstances" distinguishing their situations (citation omitted)); Adamson, 750 F.3d at 81-82 ("Because his second infraction renders him materially different from these other employees, his attempt to show disparate treatment necessarily fails.").  Karimi had also received verbal warnings, counseling, and written warnings prior to her suspensions.  Her five-day suspension was, in part, due to her history of misconduct.  There is no evidence indicating that the Town's discipline for Karimi's unauthorized break—which came barely a week after the incident leading to her three-

---

[8] The Arbitrator's Opinion and Award found that Karimi did not inform Wilkins that she was feeling unwell when he saw her taking the unauthorized break.  [Dkt. 36 at 230].  The Arbitrator also noted that Karimi testified that she did not bring up her medical issues during the investigatory meeting with the Town regarding the incident.  [Id.].  She did not obtain a doctor's note until after she had received the three- and five-day suspensions.  [Id.].  Karimi raises none of these facts here.

day suspension—was pretext for a discriminatory purpose.

Karimi's claim of pretext in relation to her ten-day suspension for insubordination similarly falls short. Although Karimi states that Falsioni, who denied Karimi's request to reduce her desk hours and initiated the complaint of insubordination against Karimi, was not her supervisor and the Library attempted to "cover up" this fact after initiating discipline, Karimi herself referred to Falsioni as her supervisor as far back as 2013, and an outdated job description simply does not imply a "cover up." See supra note 3. Karimi also argues that the Library's explanation for her suspension is pretext because another employee who used the internet at the same time as Karimi was not similarly disciplined. This, however, ignores the vast differences in Karimi and the other employee's circumstances. See Theidon, 948 F.3d at 501 (noting that comparison cases must "closely resemble one another in respect to relevant facts and circumstances" (citation omitted)); see also Paul, 948 F.3d at 52; Adamson, 750 F.3d at 81-82. Karimi had just received two suspensions. The other employee, who received a counseling session with the Library Director after the incident, was part-time and, unlike Karimi, had never been disciplined. [Dkt. 50-22 at 6; Dkt. 55 at 11-12]. The difference in discipline is therefore not suggestive of pretext.

While Karimi argues that the Town's policy of progressive discipline does not explain Karimi's discipline "when compared with other employees," the evidence does not support this statement. [See Dkt. 48 at 4]. The undisputed facts show that the Town has disciplined Library employees of other race, color, gender, and national origin for similar misconduct, including the following instances:

- In November 2015, the Town issued a written warning to a Hispanic male for insubordination when the employee reported for work when he was instructed not to. [Town SOF at ¶ 53; Dkt. 36 at 269].

- In September 2016, the Town issued a written warning for insubordination to a white female after she refused to provide help to a patron who wanted to obtain materials via an inter-library loan.  [Town SOF at ¶ 54; Dkt. 36 at 271].

- From 2015 to 2017, the Town implemented progressive discipline for a white, Irish-American male for insubordination.  [Town SOF at ¶ 52].  This employee received a written warning on July 10, 2015; a written warning on February 11, 2016; a three-day suspension in September 2016; a ten-day suspension on November 1, 2016; and a five-day suspension in September 2017 consistent with a settlement agreement.  [Id.; see Dkt. 36 at 257-67].  One example of this employee's insubordination was moving chairs into Library closets to take unauthorized breaks.  [Dkt. 36 at 260].  Another disciplinary action was for, in part, being "rude, "surly," and "miserable" toward colleagues.  [Id. at 263].  A third report stemmed from the employee ignoring a supervisor's instructions regarding his schedule and overtime pay.  [Id. at 266].

While the discipline applied was not identical in each instance, this is easily explained by differences in aggravating factors and mitigating circumstances, including prior verbal warnings, the severity of the underlying offense, and the timing of additional transgressions.  It is clear that the Town applies similar progressive discipline across the board and reprimands employees for a wide range of behavior similar to Karimi's misconduct.

The "ultimate question" is "whether, on all the evidence of record, a rational factfinder could conclude that [the protected characteristic] was a determining factor in the employer's decision."  Mesnick, 950 F.2d at 825.  Karimi's belief that she has been treated and judged more harshly than white or U.S.-born colleagues because of her heritage and cultural differences is not lost on the Court.  However, Karimi must "offer some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail" on a motion for summary judgment.  Id.  As explained, the evidence does not suggest that discriminatory animus motivated the Town to discipline Karimi.  See id. at 826 (explaining that the "vast majority of [the plaintiff's] evidence related to pretext vel non" and "had nothing at all to do with [the protected trait] or the employer's true motives").[9]  In the "absence of some significantly

_____

[9] The only evidence Karimi offers that may suggest discriminatory animus is a colleague's complaint regarding

probative evidence showing discriminatory intent," summary judgment in favor of the defendant is appropriate.  Kouvchinov, 537 F.3d at 70.  Accordingly, the Town is entitled to judgment as a matter of law, and the Court grants the Town's Motion for Summary Judgment as to Karimi's discrimination claim (Count I).

### B.  Retaliation

Retaliation claims follow a similar burden-shifting framework as discrimination claims. To succeed on a retaliation claim, a plaintiff must show that her "employer took some objectively and materially adverse action against her because she opposed a practice forbidden by Title VII."  Bhatti, 659 F.3d at 73.  That is, the plaintiff must demonstrate that she (1) engaged in protected conduct; (2) suffered an adverse employment action; and (3) that there was a causal connection between the protected conduct and adverse employment action.  Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 26 (1st Cir. 2011).  The employer then has the burden of articulating a legitimate, non-retaliatory reason for the challenged actions, and if the employer does so, the plaintiff must establish that the employer's explanation for the challenged action was pretext for retaliating.  Billings, 515 F.3d at 55.  If a plaintiff has "raised a genuine

---

Karimi and another employee, Hajhariri, speaking Farsi in the Library and the Library's request that they refrain from doing so while working.  [See Town SOF at ¶¶ 8-10; Karimi SOF at ¶ 3; Dkt. 36 at 75-76].  Slymon, the Library Director, explained to Hajhariri that this request was about inclusion, and the intent was not discriminatory. [Dkt. 36 at 75].  While Karimi acknowledged in deposition that this request was "very reasonable in a fair working environment," she also stated that it was unfair because there "were other speaking people that spoke Chinese all the time" and "nobody seemed to say anything to them."  [Dkt. 50-1 at 41].  Beyond Karimi's deposition testimony, however, there is no evidence to support this—not even employee names or affidavits by other Library employees attesting to this fact.  See Theidon, 948 F.3d at 502 (explaining that the court "cannot accept 'conclusory allegations, improbable inferences, and unsupported speculation'" even when drawing "all reasonable inferences" in the non-moving party's favor (citation omitted)).  Moreover, the request to refrain from speaking Farsi occurred in October 2014, more than eighteen months before Karimi's disciplinary issues began in earnest.  See Ray v. Ropes & Gray LLP, 799 F.3d 99, 116 (1st Cir. 2015) (noting that the "probative value" of racially derogatory marks is "circumscribed if they were made in a situation temporally remote from the date of the employment decision in question" (citation omitted)).  This request not to speak in a native language may legitimately raise doubts about the requestor's motive, but by itself, it simply does not indicate animus toward employees of Karimi's gender, race, color, or national origin.  See Cosme v. Salvation Army, 284 F. Supp. 2d 229, 239 (D. Mass. 2003) ("As a preliminary matter, an English Language Policy does not, in and of itself, constitute discrimination or disparate treatment for bilingual employees.").

issue of material fact that the defendants' stated grounds for firing him [or her] were in fact a pretext for retaliatory animus," the plaintiff "necessarily has met the lesser burden that he bears at the prima facie stage of showing a causal connection between his protected conduct and the decision to fire him [or her]."  Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 32 (1st Cir. 2015) (holding that the plaintiff had met his burden of persuasion to show pretext).

The Town argues that Karimi cannot establish a causal connection between Karimi's protected conduct and any adverse employment action and, regardless, she cannot show that the Town's legitimate, non-retaliatory reasons for the challenged actions are pretext.  [Dkt. 34 at 24-25].  The events underlying Karimi's retaliation claim are largely the same as those at the heart of her discrimination claim.  As explained, the Town has proffered legitimate, non-retaliatory explanations for those adverse employment actions, namely, performance issues and insubordination.  However, the pretext inquiry differs, and it is this on which the Court focuses.

The chronology of events may cast doubt on whether the employer's proffered explanation was the real reason for the adverse employment action.  Billings, 515 F.3d at 56. Here, the Town first received notice of Karimi's discrimination claims on December 7, 2015, when Karimi's attorney emailed DeBow, the Town's Human Resources Director, a letter that alleged age, sex, religion, and national origin discrimination in connection with the Library's hiring and promotion of information technology employees.  [Town SOF at ¶ 25; Dkt. 36 at 113-15; Dkt. 50-32].  Karimi's attorney and the Town then communicated at least three times between December 2015 and mid-March 2016.  [Karimi SOF at ¶ 6; Dkts. 50-9, 50-32].  In mid-March, Karimi informally complained about national origin discrimination to Craig, her supervisor, and Slymon, the Library Director, was informed.  [Karimi SOF at ¶ 8; Dkt. 50-11 at 1-2].  Karimi then received three- and five-day suspensions on June 8 and June 21, 2016, for

misconduct that occurred on May 25 and May 31, 2016, respectively.  Karimi lodged another

informal complaint regarding discrimination in early October 2016, when she noted on her

performance evaluation that she "hope[d] that all staff will be treated equally and without

discrimination with in [sic] order to change and create more friendly environment."  [Dkt. 36 at

149; Dkt. 50-20 at 10].  On October 15, 2016, Karimi emailed Library patrons for their support

as she went through the grievance process against the Library in connection with her three- and

five-day suspensions.  [Town SOF at ¶ 40; Karimi SOF at ¶ 13; Dkt. 50-21].  Several Library

patrons contacted the Town within days of receiving Karimi's email.  [See, e.g., Dkt. 62 at 3-9].

On November 1, 2016, Karimi, her union representative, and Slymon met to discuss the patron

emails.  [Town SOF at ¶ 42; Karimi SOF at ¶ 14].  On November 4, 2016, Karimi received a ten-

day suspension for insubordination that occurred on October 4, 2016.  [Town SOF at ¶ 39;

Karimi SOF at ¶ 15].  On December 13, 2016, Karimi was told to appear for an investigatory

meeting regarding the patron emails.  [Town SOF at ¶ 43].  On December 16, 2016, an

investigatory meeting took place.  [Town SOF at ¶ 44; Karimi SOF at ¶ 17].  On December 21,

2016, Karimi's counsel sent a letter to the Library Board of Trustees, alleging the Library was

engaging in an "ongoing course of discrimination" and retaliation against Karimi.  [Dkt. 36 at

168].  On January 26, 2017, a hearing regarding the misappropriation of patron email addresses

was scheduled, and Karimi filed a complaint with the MCAD.  [Karimi SOF at ¶ 23].  On

January 31, 2017, one day after the hearing, the Town notified Karimi that her employment had

been terminated.  [Town SOF at ¶ 48; Karimi SOF at ¶ 23; Dkt. 36 at 193-95].  The Town

learned of the MCAD complaint in February 2017.  [Town SOF at ¶ 47; Dkt. 36 at 172-91].

The timing of Karimi's discrimination complaints—including the informal complaints

lodged with her supervisor and those relayed through the patrons' emails to the Library—and her

suspensions and termination is sufficient to raise genuine issues of material fact regarding pretext

for retaliation.  In particular, the temporal proximity of Karimi's October 2016 complaints,

November 2016 suspension, December 2016 attorney letter, and January 2017 termination

provide evidence of pretext and retaliatory animus sufficient to survive summary judgment.  See

Soto-Feliciano, 779 F.3d at 33; see also Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673

F.3d 1, 15 (1st Cir. 2012) (finding a three-month gap between the protected act and adverse

action sufficient to establish a causal connection).  Karimi's October 2016 complaints[10] could

have affected the decision to suspend her for ten days in November 2016.  The December 2016

attorney letter, alleging discrimination, could have spurred the Town to terminate Karimi.  The

fact that the Town had already begun its investigation into Karimi's misappropriation of patron

contact information, which led to her termination, when it received her attorney's letter in

December 2016 is not enough to undermine this genuine issue of material fact.  While it is true

that "proceeding along lines previously contemplated, though not yet definitively determined, is

no evidence of causality" or pretext, Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272

(2001), there is no indication that the Town had already decided to terminate Karimi at the time

it received the letter.[11]  Additionally, "comments by the employer which intimate a retaliatory

mindset" can provide evidence of pretext.  Mesnick, 950 F.2d at 828.  In September 2016,

DeBow emailed Slymon and the Chair of the Library's Board of Trustees to "have a quick

---

[10] Several of the emails the Library received from patrons in response to Karimi's plea for support reference the "disciplinary action against her" [Dkt. 62 at 4], a "pending hearing" [id. at 5], being "disciplined for acting unprofessionally towards a male visitor, who suggests that [Karimi] has a bias against men" [id. at 7], "eight days of suspension" [id. at 11], and that "she had filed a grievance against the imposition of the disciplinary actions" [id.]. The Town therefore had at least a minimal idea of Karimi's complaints, as described to the Library patrons, even if it did not have a copy of the email Karimi sent to the patrons at that time.
[11] Contrary to the Town's claim, DeBow's brief email regarding the "need to send out a discipline letter for Karimi" and her inquiry into whether "there is any movement on any settlement talks" does not establish that the decision to dismiss Karimi had already been made.  [See Dkt. 55 at 20].  Moreover, this email was sent after Karimi's December 2016 letter.  [Id.].

conversation about how to prevent the Karimi hearing from becoming a circus with the Brookline Justice League in attendance."  [Karimi SOF at ¶ 11; Dkt. 50-17].  While this may be insufficient on its own to establish pretext, the Court cannot, at this time, say that it does not lend credence to the genuine issue of material fact Karimi has presented regarding retaliatory pretext.

Taken as a whole, Karimi has presented enough "evidence from which a reasonable jury could infer that the employer retaliated against" her to survive summary judgment.  Mesnick, 950 F.2d at 828.  Whether Karimi's claim proves successful remains unclear, but "under the circumstances of this case, it is the jury that must make this decision, one way or the other."  Billings, 515 F.3d at 56.  Accordingly, the Court denies the Town's Motion for Summary Judgment as to Karimi's retaliation claim (Count II).

### IV. Conclusion

For the foregoing reasons, the Town's Motion for Summary Judgment [Dkt. 33] is **GRANTED IN PART** and **DENIED IN PART**.  The Town's Motion for Summary Judgment is **GRANTED** as to Karimi's discrimination claim (Count I) and **DENIED** as to Karimi's retaliation claim (Count II).

**SO ORDERED.**

Dated: June 1, 2022                                    /s/ Angel Kelley
                                                      Hon. Angel Kelley
                                                      United States District Judge